BRETT L. TOLMAN, United States Attorney (No. 8821)
MARK Y. HIRATA, Assistant United States Attorney (No. 5087)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

FILED
U.S. DISTRICT COURT

2009 FEB 19  P 12: 33

DISTRICT OF UTAH

BY: _____
    DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **SEALED** **SEALED** |
| Plaintiff, | : | I N D I C T M E N T |
| v. | : | Vio. 18 U.S.C. §§ 1343(Wire Fraud); 2(a) (Aiding and Abetting) |
| JEFFREY LANE MOWEN, | : | |
| Defendant. | : | Case: 2:09-cr-00098 Assigned To : Benson, Dee Assign. Date : 2/19/2009 Description: USA v. |

The Grand Jury charges:

### BACKGROUND

At all times material to this Indictment,

1.     Defendant, JEFFREY LANE MOWEN, was a resident of Utah County, Utah, and maintained a bank account (No. XXX-XXX-XX35) at Mountain America Federal Credit Union ("MACU").

2.     T.F. was a resident of Utah County, Utah, and maintained several bank accounts at MACU, including accounts under the following names: BTN Tracker, LLC (No. XXX-XXX-XX01); Clear Communications, LLC (No. XXX-XXX-XX15); and Working Capital, LLC (No.

1

XXX-XXX-XX55).  During the period from around October 2006 to around June 2007, T.F.

invested money with defendant MOWEN for use in defendant MOWEN's foreign currency

trading program and real estate leveraging program, as described in paragraphs 5 and 6 below.  In

addition to his own money, T.F. invested money in defendant MOWEN's real estate leveraging

program using money loaned to him, or invested with him, by the following individuals:

a.  G.H. was a resident of Colorado, conducted business as Northern Colorado Capital, LLC, and maintained a business bank account at Wells Fargo Bank, N.A. (No. XXX-XXX-XX60).  G.H. loaned money to T.F. for investment purposes.

b.  J.M. was a resident of Utah County, Utah, conducted business as Strategic Capital, LLC, and maintained a business bank account at Zions Bank (No. XXX-XXX-X17).  J.M. loaned money to T.F. for investment purposes.

c.  P.D.T. was a resident of St. Louis, Missouri, conducted business as ASKM, LLC, and maintained a business bank account at U.S. Bank (No. XXX-XXX-XXX-XXX-X46).  P.D.T. invested money with T.F.

d.  D.B. was a resident of Utah County, Utah, conducted business as LOA Capital, LLC, and maintained a business bank account at Central Bank (No. XXX-XXX-X08).  D.B. loaned money to T.F. for investment purposes.

e.  B.W. was a resident of Utah County, Utah, conducted business as Intellectual Capital Investments, LLC, and maintained a business bank account at MACU (No. XXX-XXX-XX86).  B.W. loaned money to T.F. for investment purposes.

f.  M.A. was a resident of Utah County, Utah, conducted business as HS Capital, LLC, and maintained a business bank account at MACU (No. XXX-XXX-XX65).  M.A. loaned money to T.F. for investment purposes.

g.  J.J. was a resident of Utah County, Utah, conducted business as Rock Capital, LLC, and maintained a business bank account at MACU (No. XXX-XXX-XX31).  J.J. loaned money to T.F. for investment purposes.

3.  J.B. was a resident of Utah County, Utah.  During the period from around May

2007 to around October 2007, J.B. invested money with defendant MOWEN for use in defendant

MOWEN's foreign currency trading program, as described in paragraph 5 below.

## THE SCHEME AND ARTIFICE TO DEFRAUD

4.      From around October 2006 to around October 2008,

## JEFFREY LANE MOWEN,

defendant herein, knowingly devised and intended to devise, and did aid and abet therein, a

scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses,

representations, and omissions of material fact, and attempted to do so, by transmitting and

causing to be transmitted by means of wire communications in interstate commerce, writings,

signs, signals, pictures and sounds, in that defendant MOWEN induced T.F. and J.B. to invest

money with him for use in his foreign currency trading program, real estate leveraging program,

or both, knowing full well that returns on such investments would be drawn from both new and

old investor funds.  This type of fraudulent financial arrangement is commonly known as a

"Ponzi scheme."  In furtherance and in execution of the scheme and artifice to defraud, defendant

MOWEN caused interstate wire transfers of investment funds between and among bank accounts

identified in paragraph 2 above.

It was part of the scheme and artifice to defraud that:

5.      Defendant MOWEN represented to T.F. that he was a successful trader in foreign

currency and promised T.F. a return of 33 percent per month.  Defendant MOWEN also

misrepresented to J.B. that he was a successful trader in foreign currency and promised J.B. a

return of 8 percent per month.  During around October 2006, T.F. invested approximately

$100,000.00 with defendant MOWEN for use in his foreign currency trading program.  From

3

around May 2007 to October 2007, J.B. invested approximately $550,000.00 with defendant

MOWEN for use in his foreign currency trading program.

      6.    Defendant MOWEN also represented to T.F. that he was involved with financing

real estate projects in the following manner:

      a.    International bankers, acting as real estate transaction brokers, would contact defendant MOWEN and advise that they had a buyer who needed earnest money for a prospective real estate deal.

      b.    The earnest money, which could be as much as several million dollars, would be placed and held in escrow throughout the real estate deal.

      c.    The purpose of the earnest money was to hold the real estate deal together throughout the negotiations between the buyer and seller. Defendant MOWEN advised that the international bank could not put up the earnest money to avoid any bias towards either party to the real estate deal.

      d.    During the negotiations period between the buyer and seller, the buyer would pay 3 percentage points on the total earnest money every two weeks. If the deal failed, the earnest money would be lost. Defendant MOWEN advised, however, that he received status reports and that if the deal looked bad, he could pull the earnest money and only have to pay a penalty.

During the period from around November 2006 to around June 2007, T.F. invested over $18

million with defendant MOWEN for use in the above real estate leveraging program.

      7.    During the period from around February 2007 to around October 2007, defendant

MOWEN paid monthly investment returns to T.F. using old and new investor funds (commonly

known as "Ponzi payments"), giving T.F. the false and misleading impression that such payments

and returns on investments were from defendant MOWEN's foreign currency trading program or

real estate leveraging program. From around June 2007 to around April 2008, defendant

MOWEN paid monthly investment returns to J.B. using old and new investor funds, giving J.B.

4

the false and misleading impression that such payments and returns on investments were from defendant MOWEN's foreign currency trading program.

8.      During the period from around January 2007 to around October 2008, defendant MOWEN engaged in the following acts in furtherance and in execution of the scheme and artifice to defraud:

     a.      Contrary to his representations to T.F. and J.B., defendant MOWEN used investor funds for purposes other than investment in his foreign currency trading program or real estate leveraging program, including but not limited to the following purposes:

       (1)      Defendant MOWEN purchased over 200 high-end antique, classic, and modern vehicles, including cars, trucks, trailers, motorcycles, three-wheelers, and other vehicles.  Defendant MOWEN used these vehicles as a symbol of his success to T.F. and J.B.

       (2)      Defendant MOWEN paid numerous personal expenses, including payments to himself, his wife, E.M., dining expenses, vehicle storage fees, travel, utilities, and credit card expenses.

     b.      Returns on investments to T.F. stopped in or around October 2007. Thereafter, in an effort to lull T.F. into a false sense of security concerning his investment, defendant MOWEN made one or more of the following series of false excuses, among others, concerning why he was unable to continue making such payments:

       (1)      Defendant MOWEN claimed the he had put most of the invested funds and returns on investments into 180-day gold certificates at the Bank of Nevis.  In addition, defendant MOWEN advised that some of those funds and returns were in held in cash and cash reserves at the Bank of Nevis.  With regard to the gold certificates, defendant MOWEN advised the earliest they could be accessed was in December 2007, explaining there would be substantial penalties if the certificates were liquidated before they had matured.

       (2)      In or around September 2007, defendant MOWEN proposed transferring the above funds (i.e., the gold certificates, cash reserves, and cash) to the Pacific National Bancorp of Sweden

5

which would allow T.F. the ability to liquidate the gold certificates immediately and without the substantial penalties. Defendant MOWEN advised he could set up this arrangement based on his substantial ties to Swedish banking authorities. In addition, defendant MOWEN advised that T.F. would have greater access to and control over funds held at the Pacific National Bancorp of Sweden. Defendant MOWEN also advised that the bank needed to be offshore because there would be tax implications if the funds were brought back into the United States.

(3)     In or around late 2007, Defendant MOWEN explained there were delays in transferring funds from the Bank of Nevis to the Bank of Sweden and proposed instead transferring funds to a bank in New Zealand. Defendant MOWEN said that New Zealand's banking regulations were more favorable to his investment programs and that investors would have the same benefits offered by the Bank of Sweden. In or around December 2007, defendant MOWEN advised he had transferred investor funds to the First National Bank of New Zealand ("FNBNZ"). Despite defendant MOWEN's representations to the contrary, FNBNZ was nothing more than a shell entity set up by defendant MOWEN in New Zealand, with no banking abilities or presence.

c.     In or around December 2007, acting at defendant MOWEN's direction, T.F. and others who had invested money with T.F., set up individual accounts at FNBNZ for the purpose of accessing their funds through wire transfers from FNBNZ to their respective bank accounts in the United States. From around December 2007 to around June 2008, T.F. and others attempted unsuccessfully to wire transfer funds out of their accounts purportedly set up at FNBNZ. No funds were ever wired out of these purported accounts to investors.

9.     After October 2007, no returns on investments or refunds of investments were made by defendant MOWEN to T.F. After May 2008, no returns on investment or refund of investment were made by defendant MOWEN to J.B.

**Counts 1 through 3**
**18 U.S.C. § 1343**
**(Wire Fraud)**

10.     The Grand Jury incorporates and realleges the allegations contained in paragraphs

1 through 9 above.

      11.    On or about each of the dates identified below, in the Central Division of the

District of Utah,

**JEFFREY LANE MOWEN,**

defendant herein, knowingly and for the purpose of executing a scheme and artifice to defraud

and to obtain money by means of false and fraudulent pretenses, representations, and omissions

of material fact, and attempting to do so, transmitted and caused to be transmitted by means of

wire communication in interstate commerce, writings, signs, signals, pictures and sounds,

resulting in the following interstate wire transfers of money to T.F. in the approximate amounts

set forth below, all of which were invested by T.F. in defendant MOWEN's real estate leveraging

program:

| Count | Date of Wire Transfer | Sending Bank Customer Account No. | Receiving Bank Customer Account No. | Amount |
|---|---|---|---|---|
| 1 | 01/25/07 | U.S. Bank (Missouri) ASKM, LLC XXX-XXX-XXX-XXX-X46 | Mountain America Credit Union (Utah) Working Capital, LLC XXX-XXX-XX55 | $1,998,000.00 |
| 2 | 03/09/07 | Wells Fargo Bank (Colorado) Northern Colorado Capital, LLC XXX-XXX-XX60 | Mountain America Credit Union (Utah) BTN Tracker, LLC XXX-XXX-XX01 | $732,000.00 |
| 3 | 05/31/07 | U.S. Bank (Missouri) ASKM, LLC XXX-XXX-XXX-XXX-X46 | Mountain America Credit Union (Utah) Working Capital, LLC XXX-XXX-XX55 | $1,000,000.00 |

all in violation of 18 U.S.C. §§ 1343 and 2(a).

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

As a result of committing the felony offense alleged in Counts 1 through 3 of this

Indictment, each of which is punishable by imprisonment for more than one year, defendant

JEFFREY LANE MOWEN shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(c)

and 28 U.S.C. § 2461, any and all property constituting or derived from any proceeds defendant

MOWEN obtained, directly or indirectly, as a result of violating 18 U.S.C. § 1343 (Wire Fraud),

and any property traceable thereto.

A TRUE BILL:

/S/

_____
FOREPERSON of the GRAND JURY

BRETT L. TOLMAN
United States Attorney

_____
MARK Y. HIRATA
Assistant United States Attorney

8